UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ZACHARIAH MICHAEL POOR BEAR,<br><br>Defendant. | CR. 17-50079-JLV<br><br>ORDER |

## INTRODUCTION

Following a four-day jury trial, Defendant Zachariah Michael Poor Bear was found guilty of first-degree murder and assault resulting in serious bodily injury. (Docket 78). Defendant timely filed motions for judgment of acquittal or a new trial together with supporting briefs.[1] (Dockets 81-84). Defendant filed supplemental briefs in support of both motions. (Dockets 99 & 100). The government filed a brief opposing defendant's motions. (Docket 113). Mr. Poor Bear did not file a reply brief in support of his motions. For the reasons stated below, defendant's motion for judgment of acquittal is denied and his motion for new trial is denied.

---

[1]Because the court could not adequately address defendant's motions without the trial transcript, the court ordered that the transcript be prepared and ordered additional briefing. (Docket 94).

**ANALYSIS**

<u>MOTION FOR JUDGMENT OF ACQUITTAL</u>

Fed. R. Crim. P. 29(c) gives the district court authority to set aside a guilty verdict and enter a judgment of acquittal upon a defendant's post-trial motion. "A district court has very limited latitude in ruling upon a motion for judgment of acquittal." <u>United States v. Baker</u>, 367 F.3d 790, 797 (8th Cir. 2004) (citation and internal quotation marks omitted). "A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." <u>United States v. Boesen</u>, 491 F.3d 852, 855 (8th Cir. 2007) (citations and internal quotation marks omitted). This standard is very strict and the court should not overturn a jury verdict lightly. <u>Id.</u>

The district court must enter an acquittal if the evidence presented at trial is insufficient to sustain a conviction. <u>Id.</u> Evidence may be direct or circumstantial. <u>Baker</u>, 367 F.3d at 798. "Evidence supporting a conviction is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Boesen</u>, 491 F.3d at 856 (citation and internal quotation marks omitted). The district court must not weigh the evidence or assess the credibility of witnesses. <u>Baker</u>, 367 F.3d at 797; <u>see also</u> <u>Boesen</u>, 491 F.3d at 857 ("In ruling on a motion for a judgment of acquittal, the role of the court is not to weigh the evidence . . . but rather to determine whether the Government has presented evidence on each element to

2

support a jury verdict.") (citations and internal quotation marks omitted; ellipses in original).

The district court "views the entire record in the light most favorable to the government, resolves all evidentiary conflicts accordingly, and accepts all reasonable inferences supporting the jury's verdict."   Boesen, 491 F.3d at 856. In short, the court upholds the jury verdict if "drawing all reasonable inferences in favor of the verdict, there is an interpretation of the evidence that would allow a reasonable minded jury to find the defendant[] guilty beyond a reasonable doubt."   Id. (citations and internal quotation marks omitted; alteration in original).   "Importantly, it is not necessary for the evidence before the jury to rule out every reasonable hypothesis of innocence.   It is enough if the entire body of evidence be sufficient to convince the fact-finder beyond a reasonable doubt of the defendant's guilt."   United States v. Wright, 739 F.3d 1160, 1167 (8th Cir. 2014) (internal citation, quotation marks and brackets omitted).

THE TRIAL EVIDENCE

Accepting the directive of Boesen, 491 F.3d at 856, and viewing the evidence "in the light most favorable to the government . . . and accept[ing] all reasonable inferences supporting the jury's verdict," the following evidence was presented at trial.

During the early morning hours of May 15, 2015, 19-month-old A.H.[2] was discovered cold and non-responsive by Mr. Poor Bear. (Docket 89 at p. 84:11-12).[3] The child's mother, T.H., was awakened by Mr. Poor Bear's screaming. Id. As T.H. looked around the bedroom, she saw Mr. Poor Bear standing in a corner, screaming T.H.'s name and holding A.H. Id. at p. 84:13-15. A.H. was naked and Mr. Poor Bear was yelling that he did not know what to do. Id. at pp. 84:16-85:3. T.H. grabbed her child and placed her on the bed. Id. at p. 85:3. She noticed A.H. was cold, there was blood coming out of her mouth and the child had bruises on her face, arms and stomach. Id. at p. 85:5-7. Except for a bruise from a few days earlier, there were no bruises on A.H.'s body when T.H. had last seen her child the day before when the child was left in Mr. Poor Bear's care. Id. at p. 85:8-13.

T.H. put a diaper on her daughter because she did not want people to see her child naked. Id. at p. 85:14-21. T.H. tried to do CPR. Id. at p. 86:7. While T.H. was focused on her child, Mr. Poor Bear went about the room hiding a pipe and marijuana roaches. Id. at p. 86:7-9. T.H. laid the baby on the bed and ran out of the house leaving Mr. Poor Bear with the child. Id. at pp. 86:9-12.

---

[2]Because this case involves a minor female child and two other minors, the court refers to these individuals by their initials.

[3]Because the transcript is filed as a separate document for each day of trial the court will refer to the docket number, the page of the entry and the lines of testimony, e.g., Docket ** at p. *:**-**, as opposed to the pages of the transcript itself.

T.H's screaming woke up Ray Stoldt who had been sleeping in the next bedroom.  Id. at p. 159:3.  He quickly threw on some clothes and went into the next room.  Id. at p. 159:5-6.  He saw the child lying there with both Mr. Poor Bear and T.H. in the room.  Id. at p. 159:6-7.  T.H. was still screaming. Id. at p. 159:8.  Mr. Stoldt saw that the baby was blue and he thought she had on a onesie, or trunks and a shirt.  Id. at p. 161:11-13.

Mr. Stoldt ran out of the house and ran to three of the nearby neighbors' homes but no one answered.  Id. at p. 159:9-14.  He saw a car coming toward him and recognized the driver as Suzie Apple.  Id. at p. 159:15-17.  Mr. Stoldt asked Ms. Apple to call 911, but she did not have her cell phone so she went off down the road while Mr. Stoldt stayed outside.  Id. at p. 159:18-24.

As Mr. Stoldt was outside, he observed T.H. running out of the house screaming.  Id. at p. 162:20-25.  Moments later he saw T.H. running with a man and they ran back into the house.  Id. at p. 163:5-8.  After the police came, Mr. Stoldt observed both T.H. and Mr. Poor Bear crying.  Id. at p. 163:11-16.  T.H. was really crying while Mr. Poor Bear appeared to Mr. Stoldt to be in shock and his eyes were red.  Id. at pp. 163:21-164:9.

When Tamatane I'Atala arrived at the upstairs bedroom with T.H. he observed the baby in a diaper lying at the foot of the bed.  Id. at pp. 180:14-181:1.  Trial Exhibit 16 shows the child as Mr. I'Atala saw her.  Id. at

p. 181:3 & 10-15. He described T.H. as "still in a panic. . . . [S]he was hysterical; loud, trying to explain what was going on, just telling [Mr. I'Atala] what happened." Id. at p. 182:21-25. Mr. I'Atala observed Mr. Poor Bear "at the foot of the bed, pacing back and forth . . . . [H]e was in a panic, too, I thought. His arms were flailing up over his head and kind of grabbing his head. He was saying, 'F**k, oh f**k, sh*t, oh f**k' you know, I mean, just like in shock, looking." Id. at p. 183:3-9. Mr. I'Atala was in shock from seeing the bruising on the baby. Id. at p. 184:3-4. As he was contemplating whether to do CPR a tribal police officer came into the room. Id. at p. 184:6-18. With the presence of the police officer, Mr. I'Atala backed off, went downstairs and met another officer at the front door. Id. at pp. 184:21-185:3. Mr. I'Atala gave the officer his name and other information and left just as the ambulance pulled into the driveway. Id. at p. 185:7-12.

The first law enforcement officer to enter the room was Oglala Sioux Tribal ("OST") Police Officer Willy Gilpin. He testified T.H. "was crying; she was hysterical." Id. at p. 141:14-24. Officer Gilpin observed the child lying on the bed and she seemed unresponsive. Id. at p. 141:3-4. Trial Exhibit 16 presents the child as the officer saw her. Id. at p. 143:4-11. He reached down and "felt for a pulse and she was cold to the touch." Id. at p. 142:15-16. Because of the child's condition, there was no effort at resuscitation. Id. at p. 142:22-24. The other officers left and Officer Gilpin secured the room "until the EMTs and CIs[4] arrived." Id. at p. 145:3-5.

---

[4]Criminal Investigators.

OST Police Officer Jesse Jack arrived with Officer Gilpin. (Docket 90 at p. 25:20-21). According to Officer Jack, they arrived at the house between 6:45-6:48 a.m. Id. at p. 25:16-18. He observed T.H. "was upset, she was hysterical, yelling around." Id. at p. 27:13-15. Mr. Poor Bear "was the calmer of the two . . . he was attempting to calm her down." Id. at 27:16-18. Officer Jack did not touch the child. Id. at p. 28:3-4. While Officer Gilpin secured the room, Officer Jack went outside and requested a Bureau of Indian Affairs ("BIA") Special Agent ("SA") come to the scene. Id. at pp. 28:11-13 and 30:20-22. When T.H. came outside again she was still hysterical and yelled at the law enforcement officers on scene "[d]on't f**king stare at me." Id. at p. 32:15-21. When more officers arrived, they placed T.H. in a patrol car where she continued to scream because she did not know what was wrong with her child. (Docket 89 at p. 88:11-12). Officer Jack observed that T.H. was still crying and upset. (Docket 90 at pp. 33:24-34:30). When BIA SA Darrell Robinson arrived, Officer Jack briefed him on what was occurring. Id. at p. 30:24-25.

OST Paramedic Jolene Cunningham testified dispatch received the first call to go to the house at 709 Crazy Horse, Pine Ridge, at "approximately 6:45." Id. at p. 36:5-14. When Paramedic Cunningham went into the house, she observed the child "[l]aying on her back . . . [and] was cold to touch; was pulseless and apneic, means [sic] without breath, and showing signs of lividity." Id. at p. 37: 21-24. The witness explained "[l]ividity is when the heart stops beating, blood starts settling, and so that is the blood settling . . .

7

with gravity. . . . Lividity is one of the signs of death" <u>Id.</u> at pp. 38:19-21 and 39:3.   Paramedic Cunningham indicated the only information she was able to obtain was the child's name and date of birth because "[t]he mother was too hysterical[.]" <u>Id.</u> at p. 39:19-21.

Mr. Poor Bear's mother, Patti Stoldt, owned the house where he, T.H. and A.H. lived.   (Docket 89 at p. 188:23-24).   Also living in the house were her brother, Ray Stoldt, and A.T., Ms. Stoldt's 15-year-old son.[5]   <u>Id.</u> at pp. 188:23 and 189:16-19.   When Ms. Stoldt arrived at the house T.H. was sitting in a patrol car with her feet facing out the door and she was crying.   <u>Id.</u> at p. 194:23-24.   Mr. Poor Bear "was holding her and trying to comfort her and she was screaming and crying." <u>Id.</u> at p. 194:24-25.   Mr. Poor Bear "was like really shaking himself. . . . He was like holding her and trying to comfort" T.H. <u>Id.</u> at p. 195:2-4.   When Ms. Stoldt asked what had happened, he "[s]aid they woke up and [A.H.] was laying face down on the floor between their bed and her bed." <u>Id.</u> at p. 195:10-11.   She could not remember who said it but she thought either T.H. or Mr. Poor Bear "said that they tried to give her her nebulizer; they thought she was having an asthma attack."[6]   <u>Id.</u> at pp. 195:20-21 and 196:20-22.

---

[5]Ms. Stoldt was staying in her husband's trailer about four blocks away. (Docket 89 at p. 188:18-21).

[6]SA Robinson testified Ms. Stoldt told him it was Mr. Poor Bear who made the nebulizer statement.   (Docket 90 at p. 7:17-25).   The court allowed this testimony not for the truth of the matter asserted but to allow the jury to judge the credibility of Ms. Stoldt's testimony.   <u>Id.</u> at p. 7:6-15.

SA Robinson arrived within about 20 minutes after being contacted by OST Police Dispatch. Id. at pp. 198:12 and 199:7-8 & 15. SA Robinson went into the bedroom where he observed "[t]he child was lying on her back just wearing a diaper." Id. at p. 200: 17. What caught his eye "was the bruising; bruising on the abdomen, the head, forehead, side of the head, side of the chest; I believe it was the left hand also had bruising." Id. at p. 200:18-21. He took several photographs of the room, the positioning of the child, clothing in the room and a child's pink, fold-up bed. Id. at pp. 200:22-203:14. On the child's bed SA Robinson observed a white tissue with what appeared to be blood on it. Id. at p. 205: 11-19. The tissue and the child's bed were shipped together to the state forensic laboratory. Id. at pp. 212:19-213:1.

After processing the scene, SA Robinson spoke to Mr. Poor Bear. Id. at p. 214:14-20. The interview took place in Ms. Stoldt's car where she, Mr. Poor Bear and SA Robinson were present.[7] (Docket 90 at pp. 2:24-3:2). Mr. Poor Bear told SA Robinson that T.H. had gone out the night before so he put A.H. to bed some time between 10 p.m. and 1:12 a.m. Id. at p. 3:11-21. Mr. Poor Bear said he laid A.H. on the "pink bed next to the main bed." Id. at p. 3:23-24. Mr. Poor Bear described A.H.'s condition at the time as "fine; she was congested. She was tired and sleepy because she had been up the night

---

[7]T.H. was not in the car during this interview. (Docket 90 at p. 3:3-4).

before." Id. at p. 4:4-6. He told SA Robinson when A.H. was put to bed "she was wearing a pink top and pants." Mr. Poor Bear estimated T.H. returned home about 12 a.m. and she did not handle A.H. at that time. Id. at p. 4:20-24. He estimated he went to bed around 1 a.m. Id. at pp. 4:25-5:1. Mr. Poor Bear said when he woke up the next morning A.H. was "lying face down on her bed." Id. at p. 5:2-4. SA Robinson described Mr. Poor Bear's demeanor as "[h]e wasn't crying, but he seemed calm. Total opposite of [T.H.]." Id. at p. 5:5-7. The interview ended because T.H. came up to the car, started banging on the window and yelling at Mr. Poor Bear because she needed his support. Id. at p. 5:13-20.

SA Robinson was not able to identify how the blunt force trauma noted in the autopsy report was inflicted. Id. at p. 19:9-12. Nor was the investigation able to determine if the blunt force trauma was caused by a hand, feet or impact with any object. Id. at p. 19:13-17.

FBI SA Christian Corwin took the case when another agent, who initially started the investigation, was transferred out of district. (Docket 90 at p. 41:8-25). SA Corwin first sought to interview T.H. on March 8, 2016. Id. at p. 43:3-11. When he told her what the focus of the interview was going to be, T.H. "became very emotional; provided some information, but she was not prepared to talk about the circumstances at that time." Id. at p. 43:13-18. His next contact with T.H. occurred on July 7, 2016. Id. at p. 43:23-24. During this interview, SA Corwin had a search warrant and obtained a cheek

swab of T.H.  Id. at p. 46:9-12.  She spoke to SA Corwin for about an hour after which T.H. indicated she needed to go back to work, so they arranged to meet later.  Id. at p. 44:3-15.  SA Corwin later met T.H. at the Child Advocacy Center in Rapid City but she was unwilling to speak about what happened on May 14-15, 2015.  Id. at p. 44: 20-25.

On June 27, 2016, with a search warrant in hand, SA Corwin obtained a cheek swab of Mr. Poor Bear.  (Docket 90 at p. 45:15-24).  The next day, SA Corwin interviewed Mr. Poor Bear at the Pennington County Jail.  Trial Exhibit 48.[8]  Focusing on May 14-15, 2015, Mr. Poor Bear stated:

> [He was] [a] little foggy but, then I don't remember the day either of her death.  The morning or the morning, afternoon, evening when I got back home from just down the road from a friend's house and just as soon as just playing some X-box.  And when I came back, [T.H.] and [A.H.] were around.  They was just cleaning.  I went up to my grandpa's and grab something as was like alright yeah I'll put [A.H.] to sleep.  She goes to sleep faster with me.  I was just laying there and watching TV and it was like 11 or so, 12 o'clock or something like that.  We was watching TV and four or five minutes went by and she was asleep.  And about 15 minutes while she was asleep and [T.H.] comes walking in, she's like "I'm tired.  I want to go to sleep."  I'm like, "Yeah, me too."  And so we woke up in our towels at 5 and soap in my eyes and I saw [A.H.] there.  And I had to blink a couple of times because I didn't see her breathing.  So I jumped up.  "[T.H.], [A.H.], [A.H.]"  Turn on the lights because her toys were all over the ground.  We had no phone or cell phone at the house [at] that time.  So I was going to run down to - - - run across the road and use their phone.  But [T.H.] had already did that.  Saw some guy down the road and he came in and he called

---

[8]The entire one-hour fourteen-minute video recording of this interview was played to the jury.  Trial Exhibit 48.  The jury used Trial Exhibit 48A, a transcript of the interview, to assist while listening to the video interview.  (Docket 90 at p. 50:3-51:7).  The jurors did not have the transcript during deliberations but did have the video recording.  Trial Exhibit 48.  Unless otherwise indicated, the court will refer to Trial Exhibit 48A.

the ambulance for her and it was a pretty tough morning [inaudible]. Didn't feel like being around and just be up there with her. Trying to stay positive for [T.H.].

(Trial Exhibit 48A at pp. 20:12-21:9). When SA Corwin asked for clarification as to when T.H. came to bed, Mr. Poor Bear stated:

Like I said like I was watching her [A.H.] for like almost 45 minutes. After she laid down - - - or after [inaudible] of her being up, she went to sleep. And 15 minutes later [T.H.] came back from her grandpa's . . . . And we just went to sleep. I was still kind of out of it, still kind of trying to go to sleep myself. But [T.H.] went straight to sleep. It took me like 20 minutes to go to sleep after she did.

Id. at p. 29:7-8 and 23-26. As the interview progressed, the following exchange occurred:

SA Corwin: Okay. Where, when you said you woke up around five and you kind of struggled to see what's going on. What's the first thing that you remember seeing?

Mr. Poor Bear: She was just right there off her bed and just like in a fetal position, just like looking up. Oh well her eyes are closed and everything. I picked her up and she was ice cold.

Id. at p. 32:20-26. When asked what happened next, Mr. Poor Bear stated:

Just jumped up, ran and turned on the light and was, "[T.H.], [A.H.]." And we both started doing CPR. She was ice cold. We got her a blanky and was trying to warm her up. But I guess I was [inaudible] couldn't do anything about it because of how cold she was when I picked her up. That's when everything just really stopped for me.

Id. at p. 35:17-23. When asked what else he observed, Mr. Poor Bear stated:

I mean like it sounded she was breathing when, well, [T.H.] and I were doing CPR, but to me it just sounded like air was going through, but she wasn't picking up the response of that air. And as soon as I heard it, I thought uh, when we were [doing] CPR I thought that she was coming back.

Id. at p. 36:5-10.

SA Corwin asked Mr. Poor Bear about the previous day. When T.H. indicated she was going to her grandfather's house and wanted him to watch A.H., Mr. Poor Bear told the agent, "[y]eah, I can watch her . . . [but] was too tired to even ask any questions about what she was doing." Id. at p. 40:5-6 & 11-12.

When SA Corwin asked what the results of the autopsy would show as the cause of death, Mr. Poor Bear replied "I don't know. Nothing I can think of. I don't know, man. . . . Nothing that I can think of or. No." Id. at pp. 42:22-23 and 43:1-2. When the agent confronted him about A.H.'s significant internal injuries, Mr. Poor Bear answered "I don't know. It was just in her head or anything. Cause of it - - - I don't nothing about that - - - anything." Id. at p. 43:12-16. When asked again what happened that night, Mr. Poor Bear replied "I don't know what you're trying to say. I don't think I could live with that on my conscience." Id. at p. 45:5-7.

When asked if either T.H. or he did anything to A.H. that night, Mr. Poor Bear's responded: "All I know is that we just went to bed and we all went to bed that's all I can say. Anyways." Id. at p. 46:21-23. Mr. Poor Bear denied hitting or shaking A.H. on the night of the 14th or the morning of the 15th. "No. Everything was good between us and I was tired and went to sleep. I was already up and waiting for [T.H.] to come back." Id. at pp. 48:18-49:3. When SA Corwin challenged Mr. Poor Bear's story, he responded "Yeah. But I'm

13

sticking by my story on my side here.   [inaudible] gonna interrogate me and fall for this."   Id. at p. 49:17-19.

By the time of trial, T.H. was 19 years old.   (Docket 89 at p. 49:7-8). T.H. had been charged with being a juvenile delinquent relating to the death of her daughter, charges which were still pending at the time of Mr. Poor Bear's trial.[9]   Id. at pp. 49:22-50:1.   T.H. testified a letter[10] was issued to her attorney which promised the government would not use T.H.'s trial testimony against her.   Id. at p. 55:4-9.   The government made no other offers to T.H. about her juvenile case.   Id. at p. 55:10-14.

T.H. described A.H. on the morning of May 14, 2015, as "happy, and smiling[.]"   Id. at p. 63:20.   T.H. took A.H. to T.H.'s grandfather's house that morning and left her in the care of T.H.'s grandmother and auntie.   Id. at p. 64:20-23.   T.H. went looking for marijuana and was gone about 30 to 45 minutes.   Id. at p. 65:5-6 & 15-16.   T.H. told the jury she was not honest with the FBI about the fact she had been out trying to find marijuana.   Id. at p. 65:19-22.

After picking up her daughter, T.H. went back to Patti Stoldt's house where she, A.H. and Mr. Poor Bear lived.   Id. at p. 71:3-6.   When she got to

---

[9]While the juvenile information against T.H. was not presented to the jury, Mr. Poor Bear made the juvenile information an exhibit in a pretrial motion regarding T.H.'s cooperation with the government.   See Docket 42-2.

[10]The proffer letter issued to T.H. was not a trial exhibit, but Mr. Poor Bear included it as an exhibit in the pretrial motion regarding T.H.'s cooperation.   See Docket 42-1.

the house, Mr. Poor Bear was standing outside and T.H. asked him to take care of A.H. Id. at p. 71:8-13. T.H. testified he "was mad." Id. at p. 71:15. She left A.H. in the sole care of Mr. Poor Bear. Id. at p. 72:7-8. At that time, A.H. "had a smile on her face. She was wearing a little pink shirt and little black leggings, little cute sandals she always wears[.]" Id. at p. 72:15-17. Except for a bruise on her forehead which occurred a few days earlier, A.H. had no bruising on her face, abdomen or back. Id. at pp. 72:18-73:8. T.H. estimated she dropped A.H. off with Mr. Poor Bear at about 3 to 3:30 p.m. Id. at p. 73:9-11.

T.H. returned to her grandfather's house to use a computer to try to find marijuana. Id. at p. 73:16-20. After finding some marijuana to purchase T.H. left the house, made the purchase and returned to her grandfather's house. Id. at p. 74:3-9. T.H. estimates she remained there for five to six hours. Id. at p. 74:9-10. She hung out there with a relative, Hermis Janis. Id. at p. 74:13-22.

When she returned to the Stoldt's house, T.H. testified it was dark out. Id. at p. 76:18-22. She remained outside for about 10 minutes smoking marijuana with her friends. Id. at pp. 76:23-77:4. When she entered the house, T.H. observed Uncle Ray Stoldt sitting on the couch in the living room watching TV and the volume was louder than normal. Id. at p. 77:5-23.

T.H. went upstairs, where the bedroom door was open and the room light off. Id. at p. 78:14-19. T.H. said there was a "dim light" in the room and she

could see A.H. lying on a small padded bed.   Id. at p. 79:1-22.   That was not

the usual place A.H. slept, because she normally slept next to T.H.   Id. at

p. 79:24-80:2.   Mr. Poor Bear was still awake, "yelling at [T.H.] because I didn't

smoke with him.   He was getting mad."   Id. at p. 80:6-12.   As T.H. walked

over to A.H.'s bed to pick her up, Mr. Poor Bear "yelled at me; told me to leave

her the f**k alone because he just put her to sleep."   Id. at p. 80:12-14.   While

T.H. could not see all of A.H.'s body she noticed A.H. had on her pink shirt and

a blanket covering the bottom half of her body.   Id. at p. 80:21-24.   Because

she knew Mr. Poor Bear was intoxicated, T.H. took some Benadryl, laid down

and went to sleep.   Id. at p. 81:17-24.

        T.H. admitted that previously she told the FBI she had touched her

daughter, kissed her and that A.H. smiled at her.   Id. at p. 81:5-13.   T.H.

woke up briefly during the night or early morning hours when the front door

slammed.   Id. at p. 83:1-13.   Ms. Stoldt testified she picked up A.T. at 5 a.m.

on May 15, 2015 and took him to the Wolf Creek School so he could attend a

field trip to Denver, Colorado.   Id. at pp. 196:23 and 197:6-8.

        T.H. told the jury the next time she woke up, Mr. Poor Bear was standing

in the corner of the bedroom holding A.H. and screaming T.H.'s name.   Id. at

p. 84:9-12.   The remainder of T.H.'s direct testimony about the events of the

morning hours of May 15 appear earlier in this factual summary.

        T.H. stayed with Mr. Poor Bear for several months after A.H.'s death

because in her mind he was suicidal.   Id. at p. 88:18-22.   Every time she tried

to leave Mr. Poor Bear "threatened to kill hisself [sic]. He would tell me that I was the only one he had." (Docket 89 at pp. 88:19-89:1). Later, T.H. asked Mr. Poor Bear what happened to her daughter and according to T.H., he looked at her and yelled at the top of his lungs "to never f\*\*king ask that question again." Id. at p. 89:5-9. In a November 20, 2015, letter Mr. Poor Bear wrote to T.H.[11]

> Im sorry, I told you I cant live with you. I cant be alone. I thought you have come home already. Dont let my dumb decision make you feel sad. Just forgive me. Shit get realer when Im alone. Just keep carrying on. My heart is broken. Don't btaim your self. Big house but no one to share it with this love I have is gone I lost my way. I'll alway's watch over you. dont let me think that it's your fault because it's not. I brought this upon myself it's time for my pain stop. I have nothing on the in side no more. I hate life Im living. I can't sleep. I'm ready to go now dont do anying, but forgive me.
>
> next page →
>
> I always pushed you away. Even thoug you just there to help me. Im everything I hated. You was all I had left. I never wanted this to happen. but so be it. good bye my love, my wife, my everything. Im not going hold you back anymore. the people I need most always leave. I dont know where I went wrong. Im ready to go take care.
>
> I will always love you and watch over you. I love you so so so much. Love
> (signature of Zachariah M. Poor Bear)

(Docket 89 at pp. 89:13-16 and 90:1-9; Trial Exhibit 47).

---

[11]Mr. Poor Bear's letter is presented in its original form with no grammatical or punctuation corrections.

During cross-examination, T.H. admitted that earlier she told SA Corwin about waking up during the night and hearing the fan being put in the bedroom window. (Docket 89 at p. 96:23-25). She acknowledged a photograph of the room shows the fan was not in the window. Id. at p. 114:23-25. See Trial Exhibit 16. T.H. had no idea why the fan was placed in the location indicated in the photograph. Id. at p. 130:5-11. T.H. acknowledged being in the house for somewhere between 7 and 10 hours prior to the first 911 call at about 6:45-6:50 a.m. Id. at p. 97:1-7. T.H. testified Hermis Janis and she drove around town looking for marijuana before they were able to find two joints for $10. Id. at p. 98:8-20. They smoked one of the joints at her grandfather's house and smoked the second one in Mr. Janis' car in front of the Stoldt house. Id. at p. 99:11-13. T.H. reaffirmed her earlier testimony that when she came into the house Ray Stoldt was watching TV, which was loud, and there were beer cans on the floor. Id. at p. 104:16-18. She acknowledged Trial Exhibits 3-8 did not shown any beer cans. Id. at p. 104:20-21. T.H. testified she changed her story about A.H. moving around and smiling when T.H. got home because Mr. Poor Bear told her "that the feds came and said that they blamed the mother." Id. at pp. 106:23-107:1.

Also during cross-examination, T.H. admitted that in June 2017 she told SA Corwin alcohol was not involved in her daughter's death and she did not know if Mr. Poor Bear was drunk that night. Id. at p. 111:3-8. She admitted telling the agent her relationship with Mr. Poor Bear was perfect and he was

happy with A.H.   Id. at p. 111:15-25.   T.H. admitted telling SA Corwin that she told Mr. Poor Bear he was A.H.'s father, even though she knew he was not the father.   Id. at p. 113:13-19.   She acknowledged earlier telling SA Corwin that Mr. Poor Bear put the diaper on the baby on the morning of May 15.   Id. at p. 115:7-9.

T.H. acknowledged on cross-examination she told SA Corwin she was present when A.H. fell in the bathtub a few days earlier and got the bump on her forehead.   Id. at p. 115:22-116:4.   She told the agent she saw A.H. step on a toy truck and heard her fall.   Id. at p. 116:13-16.   At trial, T.H. testified she did not see the event happen, but was told to say she had.   Id. at p. 116:12.   T.H. acknowledged in June 2016 she posted a Facebook Happy Father's Day message to Mr. Poor Bear with a picture of A.H., herself and Mr. Poor Bear.   Id. at p. 119:4-7.

Mr. Janis testified he did not need to find marijuana on the evening of May 14 because he already had some.   Id. at p. 136:3-6.   He testified he and T.H. drove back to her house, sat in the car and smoked a joint.   Id. at p. 134:23-135:1.   He thought it might have been two joints or "one big one." Id. at p. 136:12-16.   He estimates it was after 10 p.m. when they were smoking the marijuana but that it is hard to remember.   Id. at p. 135:4-9.

Stacey Smith, a forensic scientist with the South Dakota State Forensic Laboratory testified.   She was asked to examine the child's clothing, a folding couch/bed and a wad of tissue paper received in this case.   (Docket 90 at

p. 87:9-13.   None of the items of clothing or the toddler bed showed evidence of any blood stains.   Id. at p. 89:20-25.   The wad of tissue paper contained a stain which chemically reacted to testing "for the presence of blood."   Id. at pp. 89:25-90:2.   Using the blood sample received from A.H.'s autopsy, together with buccal samples from T.H. and Mr. Poor Bear, Ms. Smith concluded the DNA profile from the tissue "was a mixture of two people."   Id. at pp.90:10-13 & 92:5-6.   "The major contributor was a match. . . . consistent with that as being from [A.H.]."   Id. at pp. 92:11 & 93:10.   That is, the blood was a match to A.H.   Id. at p. 93:18-20.   Ms. Smith opined the DNA minor contributor had to be a male.   Id. at p. 94:14-17.   She could neither include Mr. Poor Bear nor exclude him from being the minor contributor.   Id. at p. 94:18-23.   One explanation for the samples found on the tissue is that a man held the tissue and A.H. bled onto it.   Id. at p. 95:4-7.   Another explanation is that the tissue had already been used and there was a mucous contributor.   Id. at p. 98:14-18.   Ms. Smith's DNA testing excluded Mr. Poor Bear as the biological father of A.H.   Id. at p. 95:2-3.

Forensic Pathologist Donald Habbe of the Clinical Laboratory of the Black Hills in Rapid City, South Dakota, testified at trial.   Id. at p. 100:11-14. Dr. Habbe described the general protocol for conducting an autopsy.   Id. at pp. 104:1-105:11.   Dr. Habbe performed about 300 autopsies during his fellowship in Colorado and between 170-210 autopsies every year in Rapid City since 1989.   Id. at p. 105:14-17.

He performed A.H.'s autopsy at the morgue in the Rapid City Regional Hospital on May 18, 2015.  Id. at p. 106:2-7.   The child's size and body mass were consistent with her reported age of 19 months.   Id. at p. 106:19-22.   Dr. Habbe's external examination of the child's body disclosed multiple evidence of blunt force trauma.   Id. at p. 107:7-11.   She had bruises or contusions[12] involving her head and abdominal area.   Id. at p. 107:16-18 (referencing Trial Exhibit 33).   A closeup photograph of the child's face showed multiple, separate areas of contusions.   Id. at p. 107:23-25 (referencing Trial Exhibit 34).   "[T]he area above her right eye, also shows both linear or line-like areas. Those are abrasions.   That's another form of blunt force trauma."   Id. at pp. 107:25-108:3.   Dr. Habbe identified "areas of bruising above her right eye, above her left eye; there is another bruise up in there you can't see. . . . She has another area of abrasion on her nose . . . . So those are the areas of trauma."   Id. at p. 108:6-11.   There was "an area of contusion, a faint area of bruising just lateral to that right eye."   Id. at p. 109:6-7 (referencing Trial Exhibit 36).   Dr. Habbe counted the number of contusions on the child's face: "[T]he minimum I would think you could say is one, two, three; and then four here."   Id. at p. 110:22-23 (referencing Trial Exhibit 34).

According to Dr. Habbe, Trial Exhibit 38 "document[s] the injuries or the bruising on her belly area, so there's multiple areas of bruising, mostly on her

---

[12]Dr. Habbe explained that "[c]ontusion and bruising are synonyms meaning the same thing."   (Docket 90 at p. 107:13-14).

left side. There's bruising here, here, and up in here. There's bruising over on this side that we can't see in this photograph also" <u>Id.</u> at pp. 109:19-110:1. Dr. Habbe identified five areas of bruising on her abdomen. <u>Id.</u> at p. 113:17-19. The left side of the child's body showed multiple areas of contusions and impact. <u>Id.</u> at p. 114:8-14 (referencing Trial Exhibit 40). "[S]uperior to or on top of her left area are areas of contusion there and that's bruising." <u>Id.</u> at p. 114:18-19 (referencing Trial Exhibit 41).

Dr. Habbe testified the bruises to the child's face and abdomen could not be the result of one impact. <u>Id.</u> at p. 110:8-12. He arrived at this opinion "[b]ecause they are in different spots in different areas of the body. First of all, you have impact involving the face area, in multiple sites that are separate from one another." <u>Id.</u> at p. 110:14-17. Because of the multiple bruising sites, Dr. Habbe opined the child was struck in the abdomen several times. <u>Id.</u> at p. 113:20-22. Dr. Habbe testified Trial Exhibit 44 shows an area of contusion to the top of the child's left hand and a separate abrasion. <u>Id.</u> at p. 115:11-15. Trial Exhibit 46 shows an area of contusion on the child's right thigh. <u>Id.</u> at p. 116:6-7.

Dr. Habbe concluded the child's body evidenced multiple traumas "because not only do I have bruises on the back, I have them on the left side, I have them on the front, I have them on the face, I mean, so multiple areas, too." <u>Id.</u> at p. 114:23-25. It was Dr. Habbe's opinion all the bruises on the child's body "are all of similar age. . . . these bruises . . . to me they all look of

22

similar color . . . [and] they don't show evidence of healing." Id. at pp. 117:13-19 and 118:3-5.

After incising the child's skull, Dr. Habbe documented "six different areas of hemorrhage, so six different areas of hemorrhage and subcutaneous tissues . . . the tissues between her skin and her skull." Id. at p. 119:21-24. According to Dr. Habbe, the child "had two areas of . . . hemorrhage in her forehead area, she had one above each eye, she had one above her left ear . . . . There may be another one over the forehead, too, so three sort of in the middle forehead area, one above each eye, and then one superior to her left ear." Id. at p. 120:16-21. Dr. Habbe opined the child's "brain was traumatically injured." Id. at p. 127:9.

His internal examination also disclosed the child suffered tears in two separate areas of her abdomen. Id. at p. 130:18-19. These resulted in "two separate areas of bleeding or lacerations as a result of blunt force trauma." Id. at p. 131:1-2. In addition, Dr. Habbe observed "evidence of acute hemorrhage" in "the retroperitoneal space . . . around each of her kidneys[.]" Id. at pp. 134:24-135:3.

The autopsy disclosed A.H. suffered three rib fractures: two on the right and one on the left. Id. at p. 138:11-13. Dr. Habbe found these fractures to be recent and they were completely displaced. Id. at pp. 138:25-139:1. Displaced, in that each rib was broken into "two pieces . . . [and] were totally separated from one another." Id. at p. 139:2 & 9. Dr. Habbe opined "it's

really difficult to fracture those. . . . [I]t takes a significant force to fracture a child's ribs because they are so pliable.   They bend really easy."   Id. at p. 139:19-21.

Focusing on the head injury, Dr. Habbe testified that with injuries of this nature the child could be rendered unconscious immediately.   Id. at pp. 140:24-141:7.   If the child was not immediately unconscious, one would expect to notice "marked irritability; really cranky child, nausea, vomiting, things like that."   Id. at p. 141:13-16.   With reports she was a happy, normal child in the early evening of May 14, Dr. Habbe concluded the head injury had not yet occurred.   Id. at p. 142:6-11.

Dr. Habbe opined the head and abdomen injuries were the result of "significant trauma.   This isn't the result of a normal, everyday event.   This is not a clumsy child, no."   Id. at p. 145:18-19.   Dr. Habbe testified these injuries were not consistent with a fall in the bathtub several days before.   Id. at p. 128:5-7.   Dr. Habbe opined the injuries to the child's head and abdomen would require "a significant force" which an adult punch or kick could cause. Id. at p. 133:20-134:1.   He also agreed all of the child's injuries could have been caused by human hands.   Id. at p. 146:24-147:2.

During cross-examination, Dr. Habbe could not tell whether the child's diaper was put on before or after the child died, because the indentations in her skin could occur either way.   Id. at p. 148:1-149:17 (referencing Trial Exhibit 43).   Dr. Habbe testified if the diaper "was put on after the baby died,

24

you could get this change because livor [mortis] takes a while to show up. . . . [I]t takes several hours probably before you see the changes of livor mortis of the blood settling." Id. at p. 149:17-22. "You could see this result if the diaper was on the child at the time of death, and then the child dies . . . . This photograph, I would accept that." Id. at p. 150:2-4 (referencing Trial Exhibit 43). If the diaper were put on after the time of death, Dr. Habbe testified "[o]ne to two hours I would say that is fine. Three hours, I would be less confident." Id. at p. 150:5-7.

ANALYSIS

Mr. Poor Bear argues T.H.'s timeline for the evening of May 14 and the early morning hours of May 15 "is irreconcilable with Dr. Habbe's [opinion] on one important fact, the time of death." (Docket 99 at pp. 9-10). Mr. Poor Bear asserts "Dr. Habbe's testimony makes clear that for [T.H.] to have put the diaper on the child when she awoke, sometime just before the call for service went out at 6:48 a.m., the child had to have died sometime after about 3:45 a.m." Id. at p. 10. "Most importantly," the defendant contends "Dr. Habbe testified that the diaper was on the child sometime between the time of death but likely under three hours after the time of death[.]" Id. at p. 11 (referencing Docket 90 at pp. 149:24-150:7). "If the victim died in that house as the government's theory presupposes," Mr. Poor Bear argues "then based upon the objective facts ascertained by Dr. Habbe [T.H.] was there when the child was abused. That is entirely inconsistent with the prosecution's theory." Id. at

25

p. 12.   Defendant submits "[i]pso facto no reasonable inference that Poor Bear was the perpetrator of the abuse can be drawn from the timeline [T.H.] established in an effort to be absent when it occurred."   Id.

Mr. Poor Bear argues T.H. "did not just lie about who put the diaper on when Corwin interviewed her, she lied about the child being naked when she awoke and lied about Poor Bear looking for a diaper to put on the child."   Id. Defendant's ultimate conclusion is that "[n]o reasonable jury could have concluded that she was excluded as a possible perpetrator as no other evidence supported Poor Bear's guilt.   Only [T.H.'s] testimony was offered to infer that the child died before she came home the night before."   Id. at pp. 12-13.

The district court must not weigh the evidence or assess the credibility of witnesses.   Baker, 367 F.3d at 797; see also Boesen, 491 F.3d at 857.   It was the jury's function to judge the credibility of T.H. and determine whether to accept her testimony as trustworthy.   Defense counsel created his own time-of-death estimate.   Dr. Habbe never specifically identified when the child died. Rather, he only testified the indentations on A.H.'s back could have been the result of the diaper "if the diaper was on the child at the time of death." (Docket 90 at p. 150:2-3).   He was unable to tell whether the indentations at the child's waist would have been present if a different diaper was put on the child "significantly postmortem."   Id. at p. 152:2-5.   All Dr. Habbe testified to is that A.H. could have been unconscious immediately after suffering the head injuries he observed.   How long the child remained in that state before

26

expiring was never addressed.   Whether the child was unconscious or deceased when T.H. came home was for the jury to weigh and determine.

The other thing Mr. Poor Bear fails to acknowledge is that it was not just T.H.'s testimony from which the jury could infer the child died while T.H. was not home.   Mr. Poor Bear's two statements to SA Corwin acknowledge he was the sole care provider for A.H. from the late afternoon through the late evening on May 14.   The only way any inconsistencies in T.H.'s testimony become significant is if the jury rejects Mr. Poor Bear's own statements.   He makes a strong case against himself.

"A drastic change in a child's condition while alone with the defendant sufficiently supports an inference of the defendant's guilt."   United States v. White Plume, 847 F.3d 624, 627 (8th Cir. 2017).   See also United States v. Iron Hawk, 612 F.3d 1031, 1037 (8th Cir. 2010) (a non-accidental, acute injury during defendant's sole custody was sufficient to support conviction); United States v. Red Bird, 450 F.3d 789, 793 (8th Cir. 2006) (same).   "[I]t is not necessary for the evidence before the jury to rule out every reasonable hypothesis of innocence.   It is enough if the entire body of evidence be sufficient to convince the fact-finder beyond a reasonable doubt of the defendant's guilt."   Wright, 739 F.3d at 1167 (internal citation, quotation marks and brackets omitted).

Based on the trial record, the court finds the evidence supporting the convictions exists and a "rational trier of fact" could find the essential elements

27

of first-degree murder by felony child abuse and assault resulting in serious

bodily injury "beyond a reasonable doubt." <u>Boesen</u>, 491 F.3d at 856 (internal

citation omitted); <u>see</u> Docket 95 at pp. 5-8 (listing the essential elements). Put

another way, the court finds the record fails to establish that "there is no

interpretation of the evidence that would allow a reasonable jury to find the

defendant guilty beyond a reasonable doubt." <u>Boesen</u>, 491 F.3d at 855

(internal quotation marks omitted). The court comes to this conclusion after

"drawing all reasonable inferences in favor of the verdict[.]" <u>Id.</u> at 856 (internal

quotation marks omitted).

Defendant's motion for judgment of acquittal is denied.

<u>MOTION FOR NEW TRIAL</u>

Rule 33 provides that "[u]pon the defendant's motion, the court may

vacate any judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a). The decision to grant or deny a Rule 33 motion "is

within the sound discretion of the [district] court." <u>United States v. Campos</u>,

306 F.3d 577, 579 (8th Cir. 2002). The court's discretion is both broad and

limited. <u>Id.</u> It is broad to the extent the court "can weigh the evidence,

disbelieve witnesses, and grant a new trial even where there is substantial

evidence to sustain the verdict." <u>Id.</u> (citation and internal quotation marks

omitted). Additionally, "the court need not view the evidence most favorably to

the verdict." <u>United States v. Worman</u>, 622 F.3d 969, 977 (8th Cir. 2010);

<u>United States v. Lacey</u>, 219 F.3d 779, 783-84 (8th Cir. 2000) (In determining

whether to grant a Rule 33 motion, "the court need not view the evidence in the light most favorable to the government, but may instead weigh the evidence and evaluate for itself the credibility of the witnesses."). The court's discretion is limited to the extent the court must allow the jury's verdict to stand unless it determines a miscarriage of justice will occur. Id.; see also United States v. McCraney, 612 F.3d 1057, 1064 (8th Cir. 2010) ("Where a defendant moves for a new trial on the grounds that the verdict is contrary to the weight of the evidence, the district court should grant the motion if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.") (citation and internal quotation marks omitted); Worman, 622 F.3d at 978 ("A district court will upset a jury's finding only if it ultimately determines that a miscarriage of justice will occur."); United States v. Camacho, 555 F.3d 695, 705 (8th Cir. 2009) ("[A] new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice."); United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980) ("If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.").

Because a motion for new trial based on the weight of the evidence is "generally disfavored," the district court should use its authority to grant a Rule 33 motion "sparingly and with caution."   <u>Campos</u>, 306 F.3d at 579 (citations and internal quotation marks omitted); <u>see also United States v. Bertling</u>, 510 F.3d 804, 808 (8th Cir. 2007) ("A district court should not grant a motion for a new trial simply because it would have reached a different verdict.") (citations omitted).

Mr. Poor Bear seeks a new trial on two grounds.   Those are: (1) prosecutorial misconduct; and (2) the verdict was against the weight of the evidence.   Each of these arguments will be separately addressed.

## 1.   PROSECUTORIAL MISCONDUCT

To receive a new trial based on prosecutorial misconduct, "defendant must show that the government's conduct was improper and that it 'affected the defendant's substantial rights so as to deprive him of a fair trial.' "   <u>United States v. Clayton</u>, 787 F.3d 929, 933 (8th Cir. 2015) (quoting <u>United States v. Hunter</u>, 770 F.3d 740, 743 (8th Cir. 2014)) (some internal quotation marks omitted).   "In assessing the prejudicial impact of prosecutorial misconduct [the court] must consider: 1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence; and 3) the curative actions taken by the district court."   <u>United States v. Wadlington</u>, 233 F.3d 1067, 1077 (8th Cir. 2000).

A.     VARIANCE AND TRIAL BY SURPRISE

Mr. Poor Bear claims the government called T.H. as a witness, without a plea agreement, so it could "improperly benefit[] from the inference that [T.H.] was testifying at great risk to herself."   (Docket 100 at p. 13).   He argues the "clear implication" of that plan "is that any witness willing to do so is more likely giving a true statement."   Id.   Mr. Poor Bear asserts "[t]his false impression severely prejudiced Defendant whose trial strategy was to highlight that no one could offer any motive, cause or time of death.   Further, the defense intended to show that [T.H.] had little to no credibility in view of her voluminous prior inconsistent statements."   Id.

Mr. Poor Bear claims "[u]ntil voir dire was completed, the defense was operating under the assumption that [T.H.] could only testify by way of plea agreement or by the Government dropping its information against her.   By doing neither, the prosecution, knowing what [T.H.] herself knew, was able to intimate that the Government was willing to accept testimony in contradiction to its charges against her as long as it was true."   Id.   Defendant contends the government "not only gave no notice of this theory, but successfully hid its intention until opening statement when it declared the case no longer to be one of aiding and abetting.   In doing so, the prosecution varied the evidence from the charges and effectively had a witness testify contrary to its own charges." Id. at p. 14.   He argues "[t]he other necessary conclusion arising from [T.H.'s] appearance on the witness stand is one no jury could be expected to reconcile: [T.H.] could not be prosecuted once the prosecution declared the case was no longer one of aiding and abetting."   Id.

Mr. Poor Bear asserts "[t]his was no mere variance for which the defense was not prejudiced." Id. at p. 15. He contends "[t]he change in the charge and presenting [T.H.'s] denials as truth [sic] and adding her factual testimony dramatically broadened the evidence against Poor Bear." Id. "Doing so after the trial began" according to the defendant "was pure surprise for which Poor Bear could not be prepared." Id.

Because the defendant's charges were identical to the charges against T.H., defendant contends "any notice that the Government sought to convict only him inversely negated any charge against her." Id. at p. 16. Mr. Poor Bear submits the prejudice to him "was significantly heightened in how the variance was carried out." Id. "First by announcing the change in opening statement; and second, by putting the still charged [T.H.] on the stand to deny her charge and testify against him." Id. Since the settled instructions were read before opening statements and the jury knew of the charges against Mr. Poor Bear and T.H., defendant contends the instructions "were inapposite to [the government's] theory[.]" Id. By the government's conduct, Mr. Poor Bear claims he "was deprived of his right to notice of the nature of the charges *after* the trial began." Id. (emphasis in original). Mr. Poor Bear asserts he was prejudiced by the government's action because he "could not meaningfully explain to the jury that the government could not legally pursue [T.H.], leaving him without the ability to defeat the false assumption that she testified at risk to her own freedom." Id. at p. 17.

The government's response asserts the indictment properly charged the defendant "with first-degree murder and assault resulting in serious bodily

injury.   The addition of the language related to aiding and abetting did not change the charges against him or that he was charged as a 'principal' of the offenses." (Docket 113 at p. 28).   The government submits "T.H.'s fate on the charge against her was irrelevant to [what] happened to Poor Bear as it relates to the charges against him."   Id. (referencing Standefer v. United States, 447 U.S. 10, 20 (1980) ("With the enactment of [§ 2], all participants in conduct violating a federal criminal statute are 'principals.'   As such, they are punishable for their criminal conduct; the fate of other participants is irrelevant.").   The government asserts nothing about Mr. Poor Bear's ability to defend his case changed, he was still "able to attack T.H.'s credibility or seek to place the fault on her for what happened to A.H., just as he would have been able to do had the prosecution not informed the jury it would be presenting evidence of Poor Bear's direct involvement in the crimes."   Id. at pp. 28-29. "Had the United States made no such announcement and simply presented the evidence of Poor Bear's guilt without proving he aided and abetted the crimes charged," the government contends the defendant "would not be able to argue a variance occurred any more than he is now."   Id. at p. 30.

After opening statements and before the commencement of testimony, the court held a hearing out of the presence of the jury to address Mr. Poor Bear's challenge.   See Docket 89 at pp. 19:13-44:14.   T.H.'s attorney, Thomas Diggins, was present throughout the proceeding.   The September 15, 2017, proffer letter was again presented to the court.   Id. at p. 26:14-16. Government counsel assured the court and defense counsel there were no

promises made to T.H. except those contained in the proffer.   Id. at p.39:20-

21.   Government counsel explained the posture of the case:

> When this case was brought, just for the record, we had a very
> limited understanding what happened.   We had a badly beaten 19-
> month old child and two people who were caring for this child, as we
> understood it.   And we knew that [T.H.] was not there during the
> immediate time before, but then she gave this bizarre recollection of
> having seen [A.H.] neurologically sound when [T.H.] arrived home,
> and that was completely inconsistent with what we were being told
> by medical experts.   When she came forth after she was being
> represented by Mr. Diggins, she conveyed to me that she trusted Mr.
> Diggins at that time. . . .
>
> At the time she made the proffer and was coming forward and telling
> what we believe to be the truthful version, which is that [A.H.] was
> not neurologically sound and that she doesn't know that [A.H.] was,
> which is consistent with the medical evidence that we have.   And
> so based on that, the charges had already been brought, and she
> came in and proffered, and this was the way she and Mr. Diggins
> wanted to proceed.   They wanted to proceed where this trial went
> first, hers went behind that, and so the plan was always see what
> happens.   We are officers of the Court.   We represent the United
> States of America.   We will not proceed on a case that we no longer
> have just cause to do so, but we need to wait until we see what
> happens at this trial in order to make that full determination as to
> whether or not that is the case.   So that is the only reason why it's
> still proceeding as it is.

Id. at pp. 40:6-41:12.   In light of the government's position, Mr. Poor Bear

argued:

> I realize that nobody has said to [T.H.] that you are promised
> anything.   Nobody indicated that.   I fully have faith in the
> attorneys here.   I don't believe they would lie.   I am not intimating
> that when I say this: it's also a fact that the government cannot put
> her on if they expect her to tell an untruth; and, therefore, knowing
> that she's going to deny the charges against her, it remains a mutual
> situation where the government is putting somebody on the stand
> that they are saying did this to have them say they did it.   That
> creates a situation where everybody with a legal degree in this
> courtroom knows they can't proceed against her the minute that she

repeats that she didn't do it because that's the reason she's taking the stand.

Id. at pp. 42:21-43:9.

The court resolved defendant's challenge before the government called

T.H. to testify.

> Well, that all is very fertile ground for you on cross-examination, especially if she's made numerous statements. The matter of being charged as a juvenile delinquent, it's not a grand jury proceeding where a grand jury determines there's probable cause an offense has been committed and the named person committed it. Juvenile delinquency petition is filed by the United States Attorney's office using the discretion they have in the [j]uvenile [d]elinquency [a]ct to bring the charge. There's no proof that [T.H.] has committed the [j]uvenile [d]elinquency [a]ct of which she has been accused because we haven't had a hearing on her petition that is what constitutes juvenile delinquency trial. So inconsistent statements, matters that you consider to be false, that's all proper grounds for cross-examination of this witness. But in terms of it being a situation where the witness will be prohibited from testifying because she may provide information contrary to the government's decision to charge her as a juvenile delinquent, I don't think that is a proper ground to express a level of concern that you have. . . . . I will not keep [T.H.] off the stand under the circumstances described and limit her testimony at this point. But, of course, you have an absolute right on Mr. Poor Bear's behalf to vigorously cross-examine this witness.

Id. at pp. 43:10-44:10.

"A variance in the evidence affects the defendant's right to adequate notice under the Sixth Amendment." United States v. Buchanan, 574 F.3d 554, 565 (8th Cir. 2009) (internal citation, quotation marks and brackets omitted). "A variance arises when the evidence presented proves facts that are 'materially different from those alleged in the indictment.'" United States v. Watson, 895 F.3d 589, 595 (8th Cir. 2018) (citing Buchanan, 574 F.3d at 564-65 (quoting United States v. Begnaud, 783 F.2d 144, 147 n.4 (8th Cir. 1986)).

35

"Where the indictment 'fully and fairly' apprises the defendant of the allegations against which he must defend, prejudice is absent and any variance is harmless error." Id. (citation omitted).

No variance occurred in this case. Mr. Poor Bear's indictment alleged in count I that he "while aiding and abetting a known but unnamed juvenile, and while being aided and abetted by the known but unnamed juvenile, did unlawfully and with malice aforethought, kill [A.H.], a child who had not attained the age of eighteen . . . and [A.H.] was in Zachariah Michael Poor Bear's care and control, and death being caused by inflicting blunt trauma to the head and abdomen of [A.H.]" (Docket 1 at pp. 1-2). A similar allegation was made in count II, the assault resulting in serious bodily injury charge. Id. at p. 2. At trial, the government introduced evidence to prove those facts. The facts presented to the jury were not "materially different from those alleged in the indictment." Watson, 895 F.3d at 595 (internal citations omitted). The "evidence was not materially different from the allegations of the Indictment, and the Indictment fully and fairly apprised [Mr. Poor Bear] of the charges he faced at trial." Buchanan, 574 F.3d at 565.

B.    PERJURY

To prove the government used false testimony, Mr. Poor Bear is required to show "(1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's

verdict." United States v. West, 612 F.3d 993, 996 (8th Cir. 2010) (internal

citation omitted). "It is not improper [for the government] to put on a witness

whose testimony may be impeached." Id. (internal citation and brackets

omitted). "The jury is responsible for assessing the credibility of witnesses and

resolving conflicts in testimony, and its conclusions on these issues are

virtually unreviewable on appeal." Id. at 996-97.

Mr. Poor Bear argues his "conviction was obtained on perjured testimony

and . . . the prosecution knew of the perjury." (Docket 100 at p. 18). He

contends that when the government "put [T.H.] on the stand to deny the

charges, it knowingly had her testify in direct contradiction of the charges that

it was even then maintaining against her." Id. Mr. Poor Bear asserts when

the government "put [T.H.] on the stand and discussed her proffer in view of

those charges, the government suborned perjury." Id. at p. 19.

The government responds that "[a]lthough Poor Bear disbelieves or

disagrees with T.H.'s testimony, the same does not make her testimony false."

(Docket 113 at p. 35). When T.H. testified under oath, the government argues

Mr. Poor Bear "had access to and utilized T.H.'s prior statements and all

inconsistencies therein to cross examine her. . . . In other words, there existed

no surprise to the defense that T.H. would and did testify against him." Id.

For the same reasons articulated in subsection A above, the court finds

the government did not use perjured testimony. That T.H. gave contradictory

statements to law enforcement when considered against her proffer statement

does not mean her trial testimony, consistent with her proffer, was false.   The
jury heard T.H. was charged as a juvenile with the same criminal conduct as
Mr. Poor Bear; it heard her trial testimony and considered T.H.'s earlier three
inconsistent statements which Mr. Poor Bear brought out in detail during
cross-examination.   The jury assessed the credibility of T.H. and found beyond
a reasonable doubt Mr. Poor Bear was guilty of both offenses.

C.     CUMULATIVE EFFECT OF MISCONDUCT—TRIAL BY SURPRISE

Mr. Poor Bear asserts the cumulative effect of the government's
misconduct resulted in "severe prejudice" to him.   (Docket 100 at p. 19).   He
argues the same individual trial errors asserted above "were intentionally
created by the prosecution and are contrary to any notion of a fair trial."   Id. at
p. 21.   Mr. Poor Bear contends the "prosecution's intentional deceit of [him]
and the jury deprived him of due process and a fair trial."   Id. at p. 24.

As analyzed above, the court finds no error occurred, let alone an error
which deprived Mr. Poor Bear of a constitutionally fair trial.   "[T]he case as a
whole" fails to "present . . . an image of unfairness that has resulted in the
deprivation of [the] defendant's constitutional rights[.]"   United States v.
Anwar, 428 F.3d 1102, 1115 (8th Cir. 2005).

Defendant's motion for a new trial on the basis of prosecutorial
misconduct is denied.

## 2.    VERDICT AGAINST THE WEIGHT OF THE EVIDENCE

As stated earlier in this order, "[w]here a defendant moves for a new trial on the grounds that the verdict is contrary to the weight of the evidence, the district court should grant the motion if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." McCraney, 612 F.3d at 1064. "[A] new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice." Camacho, 555 F.3d at 705.   The court's discretion is limited to the extent the court must allow the jury's verdict to stand unless it determines a miscarriage of justice will occur.   Lacey, 219 F.3d 783-84.

Mr. Poor Bear reasserts his earlier argument that T.H. "was quite literally the only person who claimed to know where the child victim was at any relevant moment.   She was the only witness who put the child in Poor Bear's care at any given time.   Consequently, the verdict turned on [T.H.s'] veracity and the weight of the circumstantial evidence only she gave."   (Docket 100 at pp. 27-28).   He contends "[t]he jury was not left to weigh conflict between witnesses in this case as there was none."   Id. at p. 28.   Mr. Poor Bear argues "[t]he entirety of the conviction stands or falls on [T.H.'s] statements at trial. . . . [T.H.] had carte blanche and the ultimate motivation to say whatever she felt would exonerate her and convict Poor Bear."   Id. at p. 30.

Mr. Poor Bear poses the following question in support of his motion: "[W]hat did the investigation turn up that implicated Poor Bear, that eliminated

[T.H.] or the other two who were present in the home that evening, Ray Stoldt and A.[T.]?"[13]  Id. at p. 31.   While Mr. Poor Bear answered his own question in the negative, the court must again point out it was not just the testimony of T.H. which permitted the jury to find beyond a reasonable doubt that A.H. died while T.H. was not at home.   By his own statements to SA Corwin, Mr. Poor Bear admitted he was solely in charge of the care of A.H. throughout the afternoon and evening of May 14 and into the early hours of May 15.   What Ray Stoldt or A.T. were doing that evening is irrelevant, because A.H. was with Mr. Poor Bear the entire time.

While questions remain about Mr. Poor Bear's motive to beat A.H. and how exactly her injuries were inflicted, there is no doubt the child's injuries occurred while A.H. was in the sole custody and care of the defendant.   White Plume, 847 F.3d at 627.   A.H.'s injuries were not accidentally inflicted.   She was subjected to significant physical abuse and died as a result of that assault. Iron Hawk, 612 F.3d at 1037.

The court does not find "the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice." Camacho, 555 F.3d at 705.   In making its determination, the court weighed the evidence and assessed the credibility of the witnesses.   See Lacey, 219 F.3d at 783-84.   The court considered the oral arguments of defense counsel at trial, defense counsel's written submissions and reviewed the trial

---

[13]Defendant's designation of the last name initial was a typographical error.

transcripts. Having presided over the trial and watched the presentation of the evidence very carefully, the court finds the jury was faced with the difficult tasks of weighing the evidence and assessing witness credibility. The jury was in the best position to perform this function. Although the jury's verdict was contrary to defendant's interests, that does not render the verdict a miscarriage of justice. The court finds there is no miscarriage of justice by allowing the jury verdict to stand. Lacey, 219 F.3d at 783-84. Mr. Poor Bear is not entitled to a new trial on the indictment on sufficiency of the evidence grounds under Fed. R. Crim. P. 33(a).

Defendant's motion for a new trial is denied.

## ORDER

Based on the above analysis, it is

ORDERED that defendant's motion for a judgment of acquittal (Docket 81) is denied.

IT IS FURTHER ORDERED that defendant's motion for a new trial (Docket 83) is denied.

IT IS FURTHER ORDERED that an order will be entered scheduling the necessary deadlines for defendant's sentencing hearing.

Dated February 25, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE